(No. 62869.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. BARBARA BROOKS, Appellee.

*Opinion filed February 20, 1987.—Rehearing denied March 30, 1987.*

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Lynn M. Egan and Thomas V.

Gainer, Jr., Assistant State's Attorneys, of counsel), for the People.

Hal Ross Kessler and Mitchell C. Ex, of Kessler & Ex, and John Thomas Moran, of Chicago, for appellee.

JUSTICE MILLER delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the defendant, Barbara Brooks, was found guilty of involuntary manslaughter and sentenced to a term of five years' imprisonment. The appellate court reversed the conviction and granted the defendant a new trial (138 Ill. App. 3d 332), and we allowed the State's petition for leave to appeal (103 Ill. 2d R. 315(a)).

The defendant and her husband were indicted and tried jointly for the murder of their four-year-old son, Solomon. At the close of the State's evidence the trial judge entered a finding of not guilty in favor of Mr. Brooks. The case then proceeded against Mrs. Brooks alone, and the trial judge found her guilty of involuntary manslaughter, an included offense of murder. The State's evidence against the defendant consisted of the statements she made to the police, including a written confession, and of expert medical testimony regarding the cause of the child's death. The defendant admitted to police that on the evening of June 19, 1982, while at home in Chicago with her family, she struck the child and gave him a baby's bottle containing a mixture of salt, pepper, and water to punish him for taking a bottle from a younger child. After striking the victim with a small souvenir baseball bat, the defendant left him with her husband for further discipline; Mr. Brooks had been asleep on the second floor of the family's house. Following that, the defendant told the child to return to the basement, and she shoved him with her foot, causing

him to fall down about eight steps. The child developed diarrhea later that night. The next morning the child was taken to Roseland Hospital, and later he was transferred to Wyler Children's Hospital, where he died on June 21. According to Dr. Robert Kirschner, deputy medical examiner for Cook County, the child died as a result of blunt trauma injuries to the head with salt-water ingestion. The defendant testified at trial, and she explained that she gave the child the salt water as punishment; she denied hitting the child as she had said in her statement to the police. Two physicians who testified in the defendant's behalf attributed the child's death solely to his ingestion of salt.

The appellate court considered only one of the issues raised on appeal by the defendant. With one justice dissenting, the court determined that the State failed to present the testimony of two material witnesses at the hearing on the defendant's motion to suppress her statements. The two missing witnesses were an assistant State's Attorney named Edwards and a youth officer named Abran. Abran was in the hospital at the time of the suppression hearing, and the court believed that his testimony could be excused. The appellate court found error, however, in the State's failure to have Edwards testify, and therefore the court reversed the defendant's conviction and remanded the cause for a new trial. It may be noted that in similar cases the appellate court, in remanding the cause for a new suppression hearing under the rule in *People v. King* (1975), 61 Ill. 2d 326, has instructed the trial court to conduct a new trial only if the suppression motion is allowed. See *People v. Tucker-El* (1984), 123 Ill. App. 3d 955, 959; *People v. Parquette* (1984), 123 Ill. App. 3d 233, 238; *In re J.C.* (1979), 69 Ill. App. 3d 289, 293.

All but two of the six law-enforcement officers who took part in or witnessed the interrogation testified at

the suppression hearing, and they denied that the defendant was threatened or mistreated in any way. The defendant was questioned on some four separate occasions on June 22, 1982. She arrived at Area Two headquarters around noon that day with her husband and children. According to the State's evidence, Detectives Robert Dwyer and Raymond McNally interviewed the defendant around 12:30 or 1 o'clock that afternoon. After speaking with the pathologist, the defendant's husband, and several of the children, Dwyer conducted a second interview with the defendant around five o'clock that afternoon. At this time Dwyer advised the defendant of her *Miranda* rights. McNally and two youth officers, Abran and Holz, were present during this period of questioning. Following that interview, Dwyer offered the defendant food. The defendant was questioned a third time, around 7:30 that evening, by Assistant State's Attorney William Frost; Dwyer and another assistant State's Attorney, Edwards, were also present. Frost then summoned a court reporter, and around 9 o'clock that night the defendant gave a statement in the presence of Frost, Dwyer, and the court reporter.

The defendant testified to essentially the same chronology of events, though she believed that Dwyer and McNally talked to her on an additional occasion early in the afternoon. Also, the defendant thought that McNally and the youth officers were present at the second to the last interview, which occurred around 7:30. At the suppression hearing the defendant contended that her inculpatory statements were involuntary and resulted from threats made by the officers to take her other children from her; she did not allege any physical misconduct on the part of the officers. The defendant also testified that distress over the one child's illness and eventual death prevented her from eating or sleeping for the three days preceding the questioning. The defendant testified that,

late in the afternoon on the day of her interrogation, Dwyer and McNally entered the interview room with two youth officers, whose names she did not know. According to the defendant, the shorter, stouter youth officer threatened to take her children from her if she did not admit the killing. The defendant said that she jumped up and begged that her children not be taken away. According to the defendant, the stout youth officer said that they were getting ready to take the children, and everyone left the room. The defendant testified that about 10 minutes later Dwyer returned, alone; he was smiling, and he explained that the other officers had been trying to frighten her. According to the defendant, Dwyer said that if she admitted hitting the victim, she could take the children and go home. Dwyer then left the room. The defendant also testified that Assistant State's Attorney Edwards came in the room about 6:30 or 6:40. He was alone, and after identifying himself he asked the defendant whether she had received her *Miranda* warnings, which he then gave to her. The defendant testified that she told Edwards about the threat to take her children from her but that she was not sure whether he heard her. According to the defendant, Dwyer and the youth officers then entered the room, and they questioned her again.

The material-witness rule originated as *dictum* in *People v. Rogers* (1922), 303 Ill. 578, 590. In *People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76, it was explained that, under the rule, "[t]his court has consistently held that when the voluntary nature of a confession is brought into question by a motion to suppress, the State must produce all material witnesses connected with the taking of the statements or explain their absence." Thus, the rule requires the State to present the testimony of those who were present during the misconduct alleged. (*People v. Wright* (1962), 24 Ill. 2d 88, 93.)

As we have said, two witnesses did not testify at the suppression hearing in this case: a youth officer, Abran, and an assistant State's Attorney, Edwards. The defendant argues that Abran was a material witness because he was present during the late afternoon interview when a youth officer threatened her with the loss of the children. Holz testified at the suppression hearing, however, that Abran had been involved in a traffic accident and was in a Chicago hospital at that time. The appellate court found that to be an adequate explanation for Abran's absence, and we agree. See *People v. Wright* (1962), 24 Ill. 2d 88.

To support her argument that Edwards was a material witness, the defendant refers to the evidence that Edwards was in her presence at other times that day. Thus, the defendant cites Officer Dwyer's testimony that Edwards looked in the door briefly during the second interrogation, to explain that his shift would end soon and therefore another assistant should be requested, and Frost's testimony that Edwards may have said that he had spoken to the defendant and taken a statement from her. To this it may be added that Edwards was present during the second to the last interview, which preceded the production of the defendant's signed confession. As further support for her argument that Edwards was a material witness, the defendant refers to her testimony describing her brief conversation with him around 6:30 p.m. on the day of her interrogation. At the suppression hearing the defendant testified as follows:

> "[THE DEFENDANT]: Edwards came in by himself and he introduced himself. He said something like he was for the People, something like that.
>
> [DEFENSE COUNSEL]: He was the attorney for the People?
>
> A. Yes, and I told him, I said, 'They told me if I didn't say that I may have hit my child with a bat, they

were going to take them away,' and he just said, 'What?', and that's when Dwyer and the youth officers came in, and I just said, 'Never mind,' because I didn't want to get into any deeper trouble. I don't know whether he heard it or not, but he—"

The defendant did not testify that Edwards took part in any of the misconduct she alleges or that he was present when any of the threats were uttered, and the State's witnesses denied that the defendant was ever threatened. We need not speculate that Edwards' response was an exclamation of astonishment, for the defendant's testimony indicates that it was not—she testified that she did not know whether Edwards heard her make the complaint, and his response, according to her testimony, would indicate that he did not.

The material-witness rule was meant to serve a practical purpose, and it does not require mechanical application. (*People v. Jennings* (1957), 11 Ill. 2d 610, 618.) Thus, we fail to see how the evidence mentioned above, without more, would establish Edwards as a material witness, and therefore the State was not required to present his testimony at the suppression hearing. See *People v. Hills* (1980), 78 Ill. 2d 500, 506; *People v. Smith* (1974), 56 Ill. 2d 328, 332-33; *People v. Joe* (1964), 31 Ill. 2d 220, 226; *People v. Curtin* (1962), 24 Ill. 2d 191, 194; *People v. Sims* (1961), 21 Ill. 2d 425, 431-32.

A number of other issues were raised but not decided in the appellate court, and we shall consider them here. The defendant argues that she was deprived of the assistance of counsel by a sequestration order made by the trial judge during a recess in her testimony. At the conclusion of the defendant's direct examination a lunch recess was taken, and the trial judge explained that he was going to prohibit all communication with the defendant during that period:

"THE COURT: It is 12:00 o'clock now. I'm going to

sequester your witness. I want no one to talk to her, neither State nor you. You completed your direct. I will break with that. We'll sequester her in the conference room. Then after lunch the State will conduct their cross-examination.

Do all of you understand what you're doing?

[A DEFENSE ATTORNEY]: Judge, I'll explain to her present [*sic*] in court.

They're going to put you in this room, Barbara. Someone is to bring you food. No attorneys, nor your husband are to talk to you or be with you during this break.

THE WITNESS: Okay.

THE COURT: Okay. We'll recess this till 1:00 o'clock."

The trial resumed as scheduled, and the State began its cross-examination of the defendant at that time.

This court considered a similar restriction in *People v. Noble* (1969), 42 Ill. 2d 425. In that case the trial judge prohibited any discussion between the defendant and counsel during an overnight recess that came during the defendant's cross-examination; counsel objected to the order, but the trial judge overruled the objection and denied a motion for a mistrial. This court found that the sequestration order deprived the defendant of his sixth amendment right to the assistance of counsel and granted the defendant a new trial, rejecting the State's argument that the defendant should be required to show that he was prejudiced by the restriction. (42 Ill. 2d 425, 431.) In *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330, the United States Supreme Court found a violation of the right to the assistance of counsel in a trial judge's order, made over objection, prohibiting the defendant from consulting with counsel during an overnight recess between the defendant's direct examination and cross-examination. The recess in that case lasted 17 hours, and the *Geders* court

expressly did not decide whether orders barring communication for briefer periods would also violate the right to the assistance of counsel. (425 U.S. 80, 89 n.2, 47 L. Ed. 2d 592, 600 n.2, 96 S. Ct. 1330, 1336 n.2.) A number of courts have extended the holding in *Geders* to shorter breaks, however, including lunchtime recesses (see *United States v. Conway* (5th Cir. 1980), 632 F.2d 641; *United States v. Bryant* (6th Cir. 1976), 545 F.2d 1035; *United States v. Allen* (4th Cir. 1976), 542 F.2d 630), and the defendant contends that the trial judge's sequestration order in this case was similarly unconstitutional.

The defendant's argument must fail, however, for she has not shown an essential predicate for relief: that the trial judge's sequestration order deprived her of the assistance of counsel, for however long or short a period of time. No objection was made to the order, and neither the defendant nor defense counsel referred to it when the proceedings resumed after the lunch break. There is nothing in the record to signify that the defendant and her attorneys wished to communicate during that period. In *Bailey v. Redman* (3d Cir. 1981), 657 F.2d 21, the defendant was told not to discuss his testimony with counsel during an overnight recess called in his cross-examination. No objection was made to the order, however, and therefore the court distinguished *Geders*, which had involved a recess of similar length. The court in *Bailey* explained:

"[The defendant] did not question or object to the court's instruction nor has he presented evidence to corroborate his assertion that he failed to do so because of the 'chilling' effect of the court's admonition. [Citation.] Accordingly, we find no evidence that appellant was *deprived* of a right that he sought to exercise.

Our holding in the instant case is based not on appellant's failure to prove the exact 'prejudice' caused by his

inability to meet with counsel; rather, it is based on his failure to demonstrate that he was actually 'deprived' of his right to consult with his attorney. We concur with the district court that

> '[while it] is one thing to say that a defendant who has been deprived of the guiding hand of counsel need not demonstrate the prejudicial effect of that deprivation; it is quite another to say that he need not show that the challenged order deprived him of counsel he would otherwise have received.' [Citation.]" (Emphasis in original.) (657 F.2d 21, 24.)

In the absence of an objection to the court's order, or some similar indication that consultation with counsel was desired, we cannot say that the trial judge's order denied the defendant her right to the assistance of counsel. See *Crutchfield v. Wainwright* (11th Cir. 1986), 803 F.2d 1103; *Mudd v. United States* (D.C. Cir. 1986), 798 F.2d 1509; *Stubbs v. Bordenkircher* (4th Cir. 1982), 689 F.2d 1205; *Bailey v. Redman* (3d Cir. 1981), 657 F.2d 21; *People v. Visnack* (1985), 135 Ill. App. 3d 113; *People v. Seider* (1981), 98 Ill. App. 3d 175.

The defendant also argues that the State introduced irrelevant and prejudicial evidence of other, unrelated instances of abuse supposedly committed by the defendant against the child. Dr. Kirschner, deputy medical examiner of Cook County, attributed the child's death to blunt trauma to the head with salt-water ingestion; in summarizing the autoptic evidence he was permitted to describe, however, various other injuries suffered by the child, including injuries to his legs, buttocks, and hands. The State's purpose in presenting this information was to demonstrate the climate of abuse in which the child lived, to rebut the defendant's argument that the death was accidental; there was no showing, however, that any of those other injuries had been inflicted by either the defendant or her husband, who was also standing trial.

Even if we assume that the evidence of the other in-

juries was improperly admitted, however, we do not believe that the defendant was prejudiced by the error. The State offered the evidence to show the intentional nature of the defendant's acts, yet the trial judge found the defendant guilty not of murder but of involuntary manslaughter, which has a mental state of recklessness. Later, in sentencing the defendant, the trial judge explained, "Now, as far as the State's reference to the other marks on the child's body, I agree that there is no evidence that the other bruises, as I recall a loop mark and such on the back, there is no evidence here that Barbara Brooks caused those marks; ***." Thus, although the trial judge overruled the defendant's objection to the testimony, the record indicates that the trial judge did not make use of the information. Because the defendant was not prejudiced by the admission of the evidence, any error in this regard must be considered harmless. See *People v. Lindgren* (1980), 79 Ill. 2d 129; *People v. Romero* (1977), 66 Ill. 2d 325.

The defendant further argues that she was not proved guilty of involuntary manslaughter beyond a reasonable doubt. This argument was raised in the appellate court and, notwithstanding the decision to grant the defendant a new trial, the court should have considered the question. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309.

The cause of the child's death was a disputed issue at trial. The State's expert, Dr. Kirschner, testified that the child died as a result of blunt trauma to the head with ingestion of salt water; he said that it was not possible to determine whether one of those alone could have been the cause of death. In her confession, the defendant admitted that she had hit the child on the head. The defendant's two expert witnesses, Dr. Peter Hydemann and Dr. Lucille Lester, attributed the child's death solely to the amount of salt in his system, which in his case

produced a life-threatening condition known as hyperna-
tremia dehydration.

The offense of involuntary manslaughter is defined as
follows:

> "A person who unintentionally kills an individual with-
> out lawful justification commits involuntary manslaughter
> if his acts whether lawful or unlawful which cause the
> death are such as are likely to cause death or great bodily
> harm to some individual, and he performs them recklessly
> ***." (Ill. Rev. Stat. 1983, ch. 38, par. 9—3(a).)

The defendant first attacks the sufficiency of the State's
evidence that the child suffered multiple blunt trauma to
his head. Relying on the defense theory at trial, she then
argues that her giving the child the salt-water solution
was not an act likely to cause death or great bodily harm
and was not done recklessly.

We believe that the record contained sufficient evi-
dence on which the trier of fact—in this case, the trial
judge—could have concluded that the defendant reck-
lessly committed acts that were likely to cause death or
great bodily harm to the child, and therefore we decline
to disturb the trial judge's decision here. (See *People v.
Almo* (1985), 108 Ill. 2d 54; *People v. Locascio* (1985),
106 Ill. 2d 529.) Although the defense experts disputed
Dr. Kirschner's testimony, the trial judge was not re-
quired to accept their explanation for the child's death
and to ignore the defendant's admissions that she had
hit the child on the head. Moreover, forcing the child to
ingest the salt solution was an act likely to cause death
or great bodily harm; although death was not the neces-
sary consequence of this punishment, the defendant's
own experts testified that it was the result here. In light
of the child's poor physical development and condition,
giving the child the salt-water solution to drink could
have been viewed as a reckless act likely to cause death
or great bodily harm. Dr. Kirschner testified that an

amount of salt perhaps as little as three teaspoons could have caused this; Dr. Hydemann, in his testimony, said that one tablespoon of salt—an equivalent amount—would have been sufficient to produce the child's hypernatremic condition.

For the reasons stated, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*