THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAM McDONALD, Defendant-Appellant.

First District (1st Division)   No. 1—92—3605

Opinion filed November 27, 1995.

WOLFSON, J., dissenting.

Jeffrey S. Vollen, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Cho, and Kevin Simon, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, defendant, Sam McDonald, was convicted of the first degree murder of Aaron Ranson and sentenced to 25 years' imprisonment. On appeal, defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court improperly admitted and considered hearsay evidence; and (3) he was denied effective assistance of counsel. For the following reasons, we affirm the judgment of the trial court.

The record reveals the following relevant facts. Defendant and codefendants George Ware, Kendall Dorsey and Tyrone Jones were charged by information with attempted armed robbery and three counts of first degree murder. Prior to trial, defendant's motion to sever was granted, although his trial was conducted simultaneously with the trials of Jones and Ware.[1]

At trial, Mary Ranson testified that on September 10, 1990, her grandson, Aaron, left her home located at 2222 South State Street, Chicago, at approximately 11 a.m. Later that same day, Mary saw Aaron dead on the second floor of a building located at 2320 South State Street.

Next, Chicago police detective Ellen Weiss testified that on September 10, 1990, she and her partner, Detective Robert McGuire, investigated the fatal shooting of Aaron Ranson, a.k.a. "Pappy," at 2320 South State. From the second-floor gallery of the building, the detectives observed a pool of blood and scattered bullets. The detectives interviewed several witnesses at the scene and called an assistant State's Attorney to obtain witness statements.

Kashma Avery then testified on behalf of the State that he is currently in custody and has a case pending in criminal court for the charge of home invasion. Avery stated that he received no deals or promises in exchange for his testimony and that he expected no special treatment from the authorities.

Avery then testified that in the summer of 1990, he lived in an apartment located at 2140 South Indiana, along with his godmother, Captola Payton, defendant, and defendant's brother, Dean Kendall. Defendant lived in Avery's apartment for approximately two months during the summer and then moved back into the apartment in November 1990.

Approximately a week and a half before Thanksgiving 1990,

---

[1]Ware's conviction was affirmed in a nonpublished order of this court filed pursuant to Supreme Court Rule 23. See *People v. Ware* (1st Dist. February 23, 1995), No. 1—92—4072.

Avery had a conversation with defendant in the kitchen of his apartment, in the presence of Payton and defendant's sister, Allison Kendall. Defendant told Payton that he could not accompany her to the store on State Street because "the police and Pappy's brother [were] looking for him." After Payton left the kitchen, Avery said to defendant, "I thought that case was over with." Defendant replied no, that he had never been to jail. Avery asked defendant what he was going to do and defendant responded that he was going to wait until the "other two" were caught, and then turn himself in.

A few days later, on approximately November 20, 1990, Avery and defendant were alone in the kitchen, and Avery asked defendant what really happened on the day of the shooting. Defendant replied that on the day prior to the shooting, Ranson attempted to rob him, but was unsuccessful. On the day of the shooting, defendant and two other men heard that Ranson was gambling on the second floor of the projects. Defendant, along with "T.Y." and a third individual, armed themselves with guns, went up to the second floor, "and they lined them against the wall and he [defendant] said that T.Y. searched them, and he [defendant] finished searching him." Defendant further told Avery that T.Y. said, "[N]o one move, you won't get shot." Defendant then stated, "Someone moved, and they started shooting." Avery reported these conversations to police on December 27, 1990.

On cross-examination, Avery stated that he had been offered a six-year sentence in exchange for a guilty plea. Avery further stated that at the time he reported his conversations with defendant to the police, he was angry with defendant because defendant had moved out of the apartment, and he was angry at Allison Kendall because she owed him money for back rent. Avery added that Kendall currently owes him no money.

The State then called De Andre Wakefield as a witness. Prior to his testimony, the trial court determined that Wakefield had no right to decline to testify by invoking the fifth amendment.

Subsequently, on direct examination, Wakefield failed to answer almost all questions, invoking the fifth amendment approximately 80 times. On at least nine occasions, Wakefield disobeyed the trial court's order directing him to answer the question. At the conclusion of his testimony, the trial court found Wakefield in direct contempt of court.

On cross-examination, Wakefield stated that his testimony at this trial is the truth. Wakefield then proceeded to invoke the fifth amendment in response to a series of questions. In response to the questions of defense counsel, Wakefield then testified that on September 10,

1990, he gave statements to Detectives Weiss and McGuire in the presence of an assistant State's Attorney at the 51st and Wentworth police station. Wakefield stated that he was under arrest at that time.

Thereafter, Wakefield testified that he was not present when Ranson was shot. Wakefield stated that at approximately 11:30 a.m. on September 10, 1990, he left Wendell Phillips High School and rode a Chicago Transit Authority bus to 2310 South State Street. As he descended the bus, at approximately noon, Anton Hamilton approached him and informed him that Ranson had been shot. Wakefield and Hamilton ran to the second-floor scene of the shooting, and the police told them to leave the floor. Wakefield became embroiled in an argument with the police and was arrested for disorderly conduct.

Wakefield further stated that on September 25, 1990, Chicago police detectives Weiss and McGuire arrived at his apartment located at 2222 South State Street and escorted him to the criminal court building. While in the squad car, the detectives asked Wakefield why he was trying to run. Wakefield stated that the detectives were telling him "lies" and trying to get him to say that "they" murdered Ranson.

Wakefield recalled testifying before the grand jury that he had, in fact, been outside of the building at 2320 South State at the time Ranson was shot. However, Wakefield insisted that none of the statements he made before the grand jury were true. Wakefield further testified that the statement he gave to Detectives Weiss and McGuire was not true and that he lied to them because the detectives told him that they would drop the disorderly case against him. Wakefield stated that after he testified at the grand jury, his disorderly case was dismissed. Defense counsel then elicited the following testimony from Wakefield:

"Q. You say that you know my client, Sam?"
A. Yeah.
Q. Would you describe what he's wearing today?
A. Brown DOC suit.
Q. May the record reflect that he's identified my client:
THE COURT: Sure.
Q. Did you see Sam at any time on September the 10th, 1990?
A. No."

The parties then stipulated that Wakefield was asked the following questions and gave the following answers before the grand jury on September 15, 1990:

"Q. DeAndre, on September 10, 1990, were you—at 11:30 a.m.

were you near 2320 South State Street in the City of Chicago, Cook County, Illinois?

[No answer.]

Q. And who did you see there?

A. Tyrone Jones.

Q. And how long have you known Tyrone Jones? .

A. About ten or eight years.

Q. And did you see anyone else there?

A. Kendall Dorsey.

Q. And Kendall Dorsey, how long have you known him?

A. All my life. Grew up together.

Q. How old are you?

A. Seventeen.

Q. And so you have known him for seventeen years?

A. Uh-huh.

Q. And who else did you see there?

A. George Ware.

Q. How long have you known Ware?

A. Three years.

Q. And did you see anyone else there?

A. Sam.

Q. Do you remember Sam's last name?

A. Davis.

Q. How long have you known Sam Davis?

A. Since July 13.

Q. So roughly two months?

[Wakefield nodded]

Q. And what did you see these four men doing?

A. Coming out of the front of 2320 and going around in back coming in the building with weapons.

Q. So you saw them exit 2320. And when you say 2320, you mean 2320 State Street?

A. Yes.

Q. When they walked out of the building, you saw them holding something? What did you see them holding?

A. Saw Tyrone Jones with a nine millimeter.

Q. Did you see Kendall Dorsey with anything?

A. Tech nine.

Q. Tech nine, what?

A. Semi.

Q. Ouzi [sic][?]

A. Yes.

Q. What did you see George Ware with?

A. A revolver.

Q. What did you see Sam Davis with?

A. A revolver.

Q. What happened after you saw them walk back into 2320 South State with these weapons?

A. It was about eleven shots fired.

Q. And these eleven shots were coming from where?

A. From inside the building.

. Q. When you say 'inside the building,' where is the building at, 2320 South—?

A. 2320 South State Street.

Q. And what happened?

A. Me and Michael run up on the second floor.

\* \* \*

Q. And what happened after Steve told you that they killed Pappy?

A. Me and Michael had run up on the second floor, and then we saw Pappy.

Q. And what condition was Pappy in when you found him?

A. He was laying [sic] on the floor with a gunshot wound to the middle of his head."

The State then recalled Detective Weiss. Detective Weiss testified that she interviewed Wakefield on September 10, 1990. Neither Weiss nor her partner, Detective McGuire, threatened Wakefield nor did they make any promises to Wakefield in exchange for his statement. Weiss was not aware that Wakefield was on any form of juvenile parole at the time.

Weiss began to testify as to what Wakefield told her regarding the shooting, and defense counsel objected based on hearsay. Citing section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1992)), defense counsel argued that Weiss' testimony was not inconsistent with Wakefield's testimony because while Wakefield testified that he in fact gave the police a statement, he also testified that the statement was not true. The trial court overruled defense counsel's objection, stating as follows:

"The very issue is was the statement made on October [sic] 10th of 1990 inconsistent with what he tells us the truth is today. And for that reason it would be inconsistent, and I'm going to overrule your objection."

Detective Weiss then testified that Wakefield made a statement as follows: On the morning of September 10, 1990, at approximately 11:30 a.m., Wakefield and Anton Hamilton were at the north end of the building located at 2320 South State in an area they commonly refer to as the sprinklers. Wakefield and Hamilton saw Ranson and an individual named Sean Holman sitting and talking on a nearby

bench. After a short while, Ranson and Holman entered the building. About five minutes later, Wakefield saw defendant and codefendants walking through the fire lanes toward the building. Each of the defendants was armed with a handgun. Defendant carried a .357 magnum in his right, front pocket. Defendant and codefendants ran up the back stairway of the building. Shortly thereafter, Wakefield heard shots and took cover behind a dumpster. Wakefield asked where Ranson was and was told he was on the second-floor gallery. Wakefield ran upstairs and saw Ranson lying on the floor bleeding from the head as a result of a bullet wound.

On September 25, 1990, Detective Weiss appeared before the grand jury. Detective Weiss did not transport Wakefield to the grand jury but encountered him at the courthouse. At that time, Wakefield was in the company of Ranson's grandmother, Mary Ranson. Weiss did not go into the grand jury room while Wakefield gave his statement, nor did she or her partner coach Wakefield as to the contents of his testimony before the grand jury.

Detective Weiss further testified that on September 10, 1990, she observed 9 millimeter shell casings at the scene of the shooting.

The parties then stipulated to the impeachment testimony of Assistant State's Attorney Laura Morask. Morask would state that she interviewed Wakefield on September 10, 1990, in the presence of Detectives Weiss and McGuire. Wakefield told Morask that he and Anton Hamilton were at the north end of the building at 2320 South State Street when, at approximately 11:30 a.m., he observed Don Sean and Ranson enter the building. Five minutes later, Wakefield saw Jones, Dorsey, Sam, who's last name he did not know, and Ware. Wakefield stated that Sam had a 9 millimeter handgun in the back of his pants, and a .38-revolver in his right front pocket. Defendant and the others walked around the building, entering from the rear. A short time later, Wakefield heard several shots fired from within the building.

The parties further stipulated to the testimony of Assistant Cook County Medical Examiner Mytra Kalekar, who performed an autopsy on Ranson and determined that he died as a result of multiple gunshot wounds.

The parties further stipulated that if Sergeant J. Jackson were to testify, he would state that at noon on September 10, 1990, Wakefield was at the scene of the police investigation at 2320 South State; that Sergeant Jackson ordered Wakefield away from the scene while the evidence was being discovered; and that Wakefield refused to leave the scene. Sergeant Jackson would further state that Wakefield began to shout loud profanities toward the police, as a crowd gathered.

Fearing danger, Sergeant Jackson arrested Wakefield, subsequently signing a complaint charging Wakefield with disorderly conduct.

Finally, the parties stipulated that Wakefield was convicted of armed robbery and aggravated unlawful restraint on February 20, 1991.

The trial court entered into evidence defendant's exhibit No. 1, a certified copy of Kashma Avery's pending criminal case.

Allison Kendall, defendant's sister, then testified on defendant's behalf that she did not recall any conversation in the kitchen of Avery's apartment wherein defendant stated that he could not go to the store because the police were looking for him. Kendall admitted that she owed Avery money when she moved out of his apartment, that Avery demanded the money from her, and that Avery was angry with her because she owed him money.

Following closing arguments, the trial court found defendant guilty of first degree murder. After a hearing, the trial court sentenced defendant to a 25-year term of imprisonment.

Defendant's timely appeal followed.

Initially, defendant contends that he was not proved guilty beyond a reasonable doubt.

A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 374, 586 N.E.2d 1261; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) Because it is the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 453), this court will not substitute its judgment for that of the trial court and will not reverse a conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Campbell*, 146 Ill. 2d at 375.

In the present case, Wakefield testified before the grand jury that he saw the defendant, whom he identified as "Sam Davis," walk out of 2320 South State carrying a revolver, then reenter the building. Wakefield then about heard 11 shots fired and afterward discovered Ranson's dead body.

■ The record shows that the trial court relied on Kashma Avery's trial testimony and De Andre Wakefield's grand jury testimony in convicting the defendant. The trial court had the prerogative to reject Wakefield's trial testimony and accept instead Wakefield's grand jury testimony, as well as his statement to Detective Weiss. (See *People v. Lee* (1993), 243 Ill. App. 3d 1038, 1041, 614

N.E.2d 108; *People v. McBounds* (1989), 182 Ill. App. 3d 1002, 536 N.E.2d 1225.) The record indicates that the trial court made its decision based on Wakefield's contemptuous behavior and refusal to answer questions asked by the prosecutor. The evidence at trial was sufficient to find defendant guilty beyond a reasonable doubt.

Defendant further contends that the trial court improperly admitted as substantive evidence Wakefield's statement to Detective Weiss. Detective Weiss testified that Wakefield stated that he saw "Sam McDonald" enter the building at 2320 South State Street armed with a .357 magnum. It is defendant's position that had his statement to Detective Weiss not been admitted, there would be no evidence connecting him to the murder, because at the grand jury, Wakefield testified that he saw "Sam Davis" at the scene, and Morask testified that Wakefield did not know the last name of the "Sam" individual he saw at the scene of the crime. Defendant argues that Wakefield's statement should not have been admitted as substantive evidence through the testimony of Detective Weiss because the prosecutor failed to lay the proper foundation in eliciting the prior inconsistent statement pursuant to section 115—10.1(c)(2) of the Code of Criminal Procedure. 725 ILCS 5/115—10.1 (West 1992).

The record shows that defendant has waived this argument for review by failing to properly preserve it through specific objections, both at trial and in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190, 522 N.E.2d 1124.) Nevertheless, we find that the trial court properly admitted Wakefield's statement through the testimony of Detective Weiss under section 115—10.1(c)(2).

■ A proper foundation must be laid before prior inconsistent statements are allowed into evidence. Part of the necessary foundation is asking the witness whether he made the inconsistent statement. (*People v. Hallbeck* (1992), 227 Ill. App. 3d 59, 62, 590 N.E.2d 971, citing *People v. King* (1987), 157 Ill. App. 3d 76, 82.) The questioner must direct the attention of the witness to the time, place, and circumstances of the statement and its substance in order for the witness to have an opportunity to explain the inconsistency before the introduction of extrinsic evidence of the statement to prevent unfair surprise to the witness. *People v. Bradford* (1985), 106 Ill. 2d 492, 500-01, 478 N.E.2d 1341.

Defendant relies on *Hallbeck*. There, the State's witness, Christopher Lyga, testified that on May 3, 1989, in the early morning, he turned over some tombstones. When the prosecutor asked who was with him, he testified that he was alone. The prosecutor asked no further questions, Lyga was not cross-examined, and he was excused from court, along with other State witnesses. The State then

introduced Lyga's signed confession that both he and the defendant turned over tombstones on May 3. *Hallbeck*, 227 Ill. App. 3d at 61.

On appeal, this court reversed defendant's conviction, finding that the State failed to lay the proper foundation for admission of Lyga's signed confession by failing to confront Lyga with his signed confession, a prior inconsistent statement. *Hallbeck*, 227 Ill. App. 3d at 63.

■ *Hallbeck* is distinguishable from the present case. Here, although Wakefield contemptuously refused to answer almost all questions posed by the prosecutor during his direct examination, a proper foundation was laid for admission of Wakefield's prior inconsistent statement to Weiss during Wakefield's cross-examination by defense counsel:

"DEFENSE COUNSEL: Do you recall any statements that you may have given to anyone either—anyone from the Chicago Police Department or from the State's Attorney's Office with regard to the shooting of Aaron Ranson on September 10th, 1990?

WAKEFIELD: Yes.

DEFENSE COUNSEL: Do you recall that you gave those statements?

WAKEFIELD: Yeah.

DEFENSE COUNSEL: When did you give those statements, sir?

WAKEFIELD: September 10th.

DEFENSE COUNSEL: Who did you give those statements to?

WAKEFIELD: Detective Weiss or—and McWile. (Phn. spelling.)

DEFENSE COUNSEL: Where were you when you gave those statements, sir?

WAKEFIELD: 51st and Wentworth.

DEFENSE COUNSEL: How was that that you came to 51st and Wentworth?

WAKEFIELD: By arrest.

* * *

DEFENSE COUNSEL: Is the statement that you gave to the Detectives Weiss and McQuire [*sic*], was that statement true?

WAKEFIELD: No."

On redirect, the State inquired of Wakefield, "You said that you spoke to Detectives Weiss and McGuire. You said that in answer to that gentleman's questions, didn't you?" Wakefield responded by invoking the fifth amendment.

The record shows that Wakefield was asked whether he made the inconsistent statement, *i.e.*, the statement to Weiss. Wakefield's attention was directed to the substance of the remarks, the identity of the person to whom they were made, and the time at which they

were made. The record shows that the purposes of the foundation requirement were satisfied so as to eliminate the element of unfair surprise to Wakefield. The record shows that Wakefield was given every opportunity to explain any inconsistency between his trial testimony and his statement to Weiss, and that he declined to do so. Wakefield chose instead to negate the statement *in its entirety* by unequivocally stating "no," the statement he made to Weiss was not true. Under the circumstances, it was not necessary to ask Wakefield, *e.g.*, "In your statement to Weiss, did you say you saw Sam McDonald, armed with a .357 magnum, walk up to the building at 2320 South State?" Wakefield testified that the entire statement was untrue.

The record indicates that defendant is the very person Wakefield saw on the day of the shooting as well as at trial. During arguments for a directed finding, defense counsel argued as follows:

"Mr. Wakefield in his statement which was—viewed in the light most favorable to the State, in his statement he says that he's outside the building. He sees *my client* with a gun go into the building. He hears shots, and he sees people run out. There is nowhere in there in that testimony evidence of any intent to rob anyone." (Emphasis added.)

Moreover, defendant's Federal Bureau of Investigation LEADS *report* reveals that defendant used the alias "Sam McGuire" in connection with his arrest in this case. The totality of the record in this bench trial leads to the conclusion that both sides were fully aware that Wakefield was speaking of the same "Sam," whether Davis, McDonald, McGuire, or any other name. Thus, it is immaterial whether Wakefield was asked at trial if he said the name "Sam McDonald" in his statement to Detective Weiss.

Offered a choice, the record shows that defendant elected to proceed to a bench trial, rather than a trial by jury. A reviewing court will presume that a trial judge knows the law, and this presumption is rebutted only when the record affirmatively shows the contrary. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 322, 570 N.E.2d 344.) Here, the record shows that the trial judge carefully considered defense counsel's objection to introduction of Wakefield's statement, at length explaining section 115—10.1 and its application to the issue, prior to overruling defense counsel's objection. In light of this record, any error in admission of the statement is harmless.

Finally, defendant contends that he was denied effective assistance of counsel during trial because on at least one occasion, he shared a holding cell with prosecution witness De Andre Wakefield. Defendant argues that he was therefore deprived of his sixth amendment right to speak confidentially with his attorney.

The record shows that on the second day of trial, defense counsel asked that Wakefield be barred from testifying because he was forced to discuss his defense case with defendant in front of Wakefield. The trial court responded that it was first notified of the lockup situation on the previous day, and at that time, it ordered defendant and Wakefield be separated. The trial court overruled defense counsel's objection, noting that it was defense counsel's choice to confer with defendant in Wakefield's presence.

Defendant then raised this issue in his post-trial motion, arguing that he was "forced to have consultations in the immediate presence" of Wakefield. Upon denying his motion, the trial court noted that Wakefield did not cooperate with the State at trial and that defendant was not prejudiced by having been housed in the same lockup as Wakefield.

A defendant's right to confer with counsel is explained in *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330. There, the United States Supreme Court held that a defendant's constitutional right to consult with counsel was violated where a trial court instructed a defendant and his counsel not to discuss anything about the case during an overnight court recess. The Court concluded that this was a critical time in the proceeding because it would be during the night that counsel and his client would confer to map strategy, obtain potentially valuable information from the defendant not disclosed during his testimony or merely to "discuss with counsel the significance of the day's events." *Geders*, 425 U.S. at 88, 47 L. Ed. 2d at 599, 96 S. Ct. at 1335.

Recently, in *People v. Abrams* (1994), 260 Ill. App. 3d 566, 631 N.E.2d 1312, a defendant argued that his ability to consult with his attorney was impermissibly impaired when he was unable to confer with his attorney in a private room during a lunch recess, because of poor acoustics in a holding cell. This court determined that *Geders* was not violated by a situation such as this that rendered client/ attorney consultations less than ideal. This court determined that reversible error obtains according to *Geders* only where the trial court actively prevents a defendant from seeing his attorney, *i.e.*, where the trial court issues an order sequestering the defendant during a recess, thereby specifically preventing counsel from conferring with his client.

■ A defendant has the obligation to prove that he was actually denied his right of consultation. (*People v. Brooks* (1987), 115 Ill. 2d 510, 505 N.E.2d 336.) In the present case, the trial court imposed no prohibition comparable to a sequestration order. Therefore, defendant has failed to establish that his ability to consult with counsel

was actually impaired, a factor our supreme court found to be an "essential predicate for relief" in cases such as this. *Brooks*, 115 Ill. 2d at 520, 505 N.E.2d at 340.

For all of the reasons set forth herein, we affirm the judgment of the trial court.

Affirmed.

BRADEN, J., concurs.

JUSTICE WOLFSON, dissenting:

The majority's misreading of section 115—10.1(c)(2)(B) poses a grave danger to the integrity of the fact-finding process in criminal cases. If the majority is correct, police officers will have acquired a new and unjustified power to put words in the mouths of purported eyewitnesses.

Until July 1, 1984, a nonparty witness' prior inconsistent statement was allowed in a criminal case only for impeachment, to attack the witness' believability, not as substantive evidence. See *People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169.

That changed, in certain circumstances, with the passage of section 115—10.1. The relevant portion of the statute provides:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

***

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

***

(B) *the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding.*" (Emphasis added.) 725 ILCS 5/115—10.1 (West 1992).

The purpose of the statute is to break free from the limitations courts had placed on prior inconsistent statements. Section 115—10.1 allows the trier of fact to consider a witness' inconsistent statements made closer in time to the events at issue. Turncoat witnesses, wilful

or inspired by fear, cannot completely frustrate the fact-finding process.

The operative word in section 115—10.1(c)(2)(B) is "acknowledge." The witness must "acknowledge" the words attributed to him by the police officer, not that he made some unspecified statement. Otherwise, the witness' statement would be whatever the police officer says it is.

The majority says "Wakefield's attention was directed to the substance of the remarks ***." (276 Ill. App. 3d at 476.) No it wasn't. The entire examination on the subject, conducted by defense counsel, was:

"DEFENSE COUNSEL: Do you recall any statements that you may have given to anyone either—anyone from the Chicago Police Department or from the State's Attorney's Office with regard to the shooting of Aaron Ranson on September 10, 1990?

WAKEFIELD: Yes.

DEFENSE COUNSEL: Do you recall that you gave those statements?

WAKEFIELD: Yeah.

DEFENSE COUNSEL: When did you give those statements, sir?

WAKEFIELD: September 10th.

DEFENSE COUNSEL: Who did you give those statements to?

WAKEFIELD: Detective Weiss or—and McWile. (Phn. spelling.)

DEFENSE COUNSEL: Where were you when you gave those statements, sir?

WAKEFIELD: 51st and Wentworth.

DEFENSE COUNSEL: How was that that you came to 51st and Wentworth?

WAKEFIELD: By arrest.

* * *

DEFENSE COUNSEL: Is the statement that you gave to the Detectives Weiss and McQuire [sic], was that statement true?

WAKEFIELD: No."

Based on that foundation, Detective Weiss was allowed to testify that Wakefield told her: on the morning of September 10, 1990, at about 11:30 a.m., he and Anton Hamilton were at the north end of the building located at 2320 South State in an area they commonly refer to as the sprinklers. Wakefield and Hamilton saw Ranson and an individual named Sean Holman sitting and talking on a nearby bench. After a short while, Ranson and Holman entered the building. About five minutes later, the defendant, whom he identified as Sam McDonald, and codefendants walked through the fire lanes toward the building. Each of the defendants was armed with a handgun. Mc-

Donald carried a .357 magnum in his right, front pocket. McDonald and codefendants ran up the back stairway of the building. Shortly thereafter, Wakefield heard shots and took cover behind a dumpster. Wakefield asked where Ranson was, and he was told he was on a second-floor gallery. Wakefield ran upstairs and saw Ranson lying on the floor, bleeding from the head as a result of a bullet wound.

Wakefield, at trial, had not acknowledged uttering a single word contained in Detective Weiss' account of his statement. Yet, the statement was used by the trial judge to connect the defendant to the crime. That cannot be harmless error. It is plain error, "marked by fundamental unfairness," obviating the need for a more specific objection in this closely balanced case. See *People v. Keene* (1995), 169 Ill. 2d 1, 17.

It does not take much imagination to picture the mischief the majority opinion could cause if taken seriously.

I suspect the author of the statute would be disturbed by today's holding. He has written:

> [I]f the witness under voir dire examination denies that he ever made the statement to the officer, then his prior inconsistent statement could not be used by the prosecutor *** . Because the witness had not acknowledged the statement under oath, the requirements of subsection (B) were not met." R. Steigmann, *Prior Inconsistent Statements As Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 642 (1984).

True, Wakefield admitted he made a "statement" to Detective Weiss. But there is no way to know Wakefield and Weiss were talking about the same statement. The only way to find out is to ask the witness if he said those words to the detective. If he says he did, the statement may come in as substantive evidence. He has "acknowledged" the statement. Detective Weiss would not be needed. It doesn't matter that he now says the words are untrue. If he says he did not say the words, the purported oral statement cannot become substantive evidence, although it arguably can be introduced to impeach the believability of the witness. I believe that is the purpose and spirit of section 115—10.1(c)(2)(B).

I am not urging a hypertechnical or hairsplitting reading of the statute. If out-of-court statements, hearsay until July 1, 1984, are to be used as substantive evidence in criminal cases, safeguards against abuse must be in place. It should be clear that the prior inconsistent oral statement actually was made. By requiring that the witness "acknowledge" the words of his or her oral statement, the drafters of the statute sought to ensure the integrity of the evidence.

The traditional impeachment foundation requires the questioner

to direct the witness' attention to the time, place, circumstances, and substance of the prior inconsistent statement. (*People v. Bradford* (1985), 106 Ill. 2d 492, 500, 478 N.E.2d 1341.) That foundation avoids unfair surprise and gives the witness an opportunity to explain the inconsistency. *People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876.

Subsection (c)(2)(B) goes further. Not only must the witness be asked if he made the prior oral inconsistent statement, he must acknowledge that he did. *People v. Denny* (1991), 221 Ill. App. 3d 298, 302, 581 N.E.2d 839; *People v. Posedel* (1991), 214 Ill. App. 3d 170, 177, 573 N.E.2d 256.

Professor Graham, whose work inspired the statute (Steigmann, 72 Ill. B.J. at 638), agrees:

"While prior oral statements acknowledged by the witness to have been made during her current testimony or at an earlier trial, hearing, or other proceeding are also included, subsection (c)(2)(B) [citations], unacknowledged oral statements are not. Unacknowledged oral statements are most likely not to have been made and the most likely, if made, to have been unfairly obtained." See M. Graham Cleary & Graham's Handbook of Illinois Evidence § 801.9, at 662 (6th ed. 1994).

Section 115—10.1 "does not excuse the need for a proper foundation prior to the admission of an inconsistent statement." (*People v. Hallbeck* (1992), 227 Ill. App. 3d 59, 63, 590 N.E.2d 971.) The foundational requirement takes on more importance when the prior statement is being elevated to the level of substantive evidence. The integrity and reliability of the hearsay should not be in doubt. The risk of misuse is highest when the purported prior statement is oral. That is why the statute exacts a higher foundational standard before oral statements can be considered as substantive evidence. Justice Steigmann:

"Accordingly, the rules severely restricting the use of prior inconsistent statements for impeachment purposes only ought to be more strictly adhered to—not less. To do otherwise would reward sloppy investigative practices and would remove the incentive to comply with the new statute." Steigmann, 72 Ill. B.J. at 643.

In *People v. Redd* (1990), 135 Ill. 2d 252, 313-14, 553 N.E.2d 316, the court was asked to judicially amend section 115—10.1 by adding a catchall residual exception to the hearsay rule. The court declined, saying:

"If a prior inconsistent statement is to be admitted in Illinois *** as substantive evidence against a defendant, the statement must meet the requirements set out by the General Assembly in section 115—10.1. If the prior statement fails to meet these requirements, it is not admissible as substantive evidence."

Detective Weiss' testimony about Wakefield's prior statement did not meet the requirements of the statute. It was reversible error to admit the evidence. I respectfully dissent.