THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM SUTHERLAND, Defendant-Appellant.

First District (6th Division)    No. 1—98—3802

Opinion filed December 1, 2000.

1118

Rita A. Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:

Following a jury trial, defendant William Sutherland was convicted of two counts each of attempted first degree murder, aggravated battery with a firearm and home invasion. The trial court sentenced de-

fendant to 30 years in prison for each attempted murder charge and 30 years in prison for home invasion. The court ordered that defendant's sentences be served consecutively for a total sentence of 90 years.

On appeal, defendant contends that: (1) the trial court abused its discretion in finding that a six-year-old child who was a victim of the crime was competent to testify; (2) the State failed to prove his guilt beyond a reasonable doubt because its case rested upon the child's eyewitness identification and inconsistent testimony; (3) the trial court erred in incarcerating defense counsel for contempt overnight during his trial; (4) the prosecution made improper statements in closing argument; (5) section 5—8—4(a) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—8—4(a) (West 1996)) violates due process because it allows the trial court to impose consecutive sentences based upon the judge's findings of fact rather than a jury determination of proof of those facts beyond a reasonable doubt; and (6) in light of defendant's rehabilitative potential, the trial court abused its discretion in sentencing him to 90 years. For the reasons set forth below, we affirm defendant's convictions and sentence.

At trial, Elaine Sutherland (Sutherland) testified that in 1997 she lived at 6818 South Sangamon in Chicago with her mother, Doris Ellison, her six-year-old daughter, Erica Ellison, and her four-year-old son, William Sutherland, who was also defendant's son. On April 10, 1997, defendant arrived at her residence and demanded to be let in. Sutherland called police, who escorted defendant in the house to retrieve a television, a word processor and his wedding ring. The following afternoon, defendant called Sutherland and asked her to attend marital counseling. Sutherland told defendant that she wanted a divorce and testified that he replied with "a threatening okay." Sutherland and her daughter went to bed at about 10 p.m., and her mother left to work a night shift.

Sutherland testified that the next thing she remembered was waking up in the hospital with bullet wounds in her back and arm. Sutherland testified that she did not remember how her injuries occurred but that she signed an affidavit in September 1997 that accompanied a petition for an order of protection against defendant. The affidavit stated that defendant had shot Sutherland and her daughter a total of nine times while they slept. Sutherland stated that the affidavit was based upon Erica's explanation of what had happened. Sutherland testified that Erica knew that Eric Kendrick was her biological father, but that Erica called defendant "daddy" at times. She said Erica also called Kendrick "daddy."

Prior to Erica Ellison's testimony, defense counsel objected to her

competency as a witness. Outside the presence of the jury, Erica testified that she was six years old and about to enter first grade. Erica recited the alphabet and said that she knew the difference between telling the truth and telling a lie because when a person tells the truth, "people get happy with you," and when someone lies, "people get mad that you hurt them" and "you will get put in a room and get a whopping." She said it was better to tell the truth and that she would do so in court "because I want everybody to know." She stated that she knew what it meant to promise to tell the truth. Erica stated that she knew that Sesame Street characters were "pretend" and not real, but that the Power Rangers got into "real fights." She stated that defendant was her stepfather and Kendrick was her father. The trial court found Erica competent to testify.

Erica then testified before the jury. She identified defendant in court, stating that he was her "stepdaddy." Regarding the night of the shooting, Erica testified that she and her mother went to bed while her grandmother was at work. After going to bed, she heard a noise and saw defendant turn on the light and shoot her mother. Erica stated that she knew it was defendant because she saw his face, and she again identified defendant in court. Erica stated that defendant shot her once on the left side of her face above her lip. Erica said the police showed her pictures of defendant and that she told the officers who defendant was and what he had done. Erica said she had another "daddy" besides defendant and named her "daddy" as Kendrick, but she said that Kendrick was not in the bedroom that night. On cross-examination, Erica stated that when she talked about defendant, she always referred to him as her "stepdaddy."

Matt Roberts testified that he was Doris Ellison's cousin and lived with his girlfriend in the apartment above Ellison's. After 11 p.m. on April 11, 1997, he heard a crashing noise coming from the front of the building. Four or five seconds later, Roberts heard several popping sounds. Roberts went downstairs and found the front door to Ellison's apartment open. Roberts entered and saw Erica, who was bleeding from the mouth and had a small hole near her chin. Roberts testified that when Erica saw him, she said, "Matt, Will done shot us." On cross-examination, Roberts stated that he used Erica's exact words.

Doris Ellison testified that on April 10, she called police at about 10:20 p.m. because defendant was beating on her door and refused to leave. The following day, defendant called her apartment constantly. Ellison spoke to defendant once and heard Elaine tell him that she wanted a divorce. On the night of the shooting, Ellison worked an 11 p.m. to 7:30 a.m. shift. When she left for work, Elaine and Erica were in the bedroom. Ellison stated that Erica had called defendant "dad"

in the past. Ellison said that she was about 5 feet 3 inches tall and that Kendrick was slightly taller than she was, but that he was not 6 feet tall.

Tahlia Hardy testified that at about 10:30 p.m. on the night of the shooting, she and her husband went to her mother's residence at 6812 South Sangamon, which was near Doris Ellison's house. Hardy remained in their parked car while her husband went inside to pick up their children. Hardy testified that a gold car pulled up directly in front of Ellison's residence and in front of Hardy's car. A dark-skinned man who was 6 feet tall with a slight beard and glasses opened the trunk of the gold car. Hardy identified defendant in court as the man she saw that night. She testified that defendant reached into the trunk for about 10 seconds and walked up to Ellison's porch, looking back at Hardy as he stood on the porch. Hardy testified that defendant did not knock on the door or ring the doorbell and that he returned to his car. On April 12, Hardy identified defendant and his car from police photos. On cross-examination, Hardy stated that defendant was the only man in the photo array wearing glasses.

Dr. Leslie Schaffer testified that he treated Elaine Sutherland about four hours after the shooting. Elaine sustained gunshot wounds to her forearm, chin, jaw, shoulder, chest and left forearm, and bullet fragments remained in her left jaw.

Chicago police officer Maudessie Jointer testified that she and her partner were called to Ellison's residence at about 11:20 p.m. Erica was bleeding from a gunshot wound near her mouth. Jointer asked Erica who had hurt her, and she replied that her daddy shot them. Chicago police officer Patricia Kane asked Erica what her daddy's name was. Erica stated that her daddy Will shot them. Jointer testified that she also heard Erica say "William," "S" and "land."

Kane testified that Erica said that her daddy shot her and her mom and that her daddy's name was Will. When Kane asked for her daddy's last name, Kane was unsure what Erica said. Kane located an envelope bearing defendant's name and address and Erica said that was who she was trying to identify. Erica also identified defendant from a photograph in the residence.

Chicago police detective Kevin White testified that, at about 11:20 p.m., he, Kane, and another officer were directed to Ellison's apartment and then went to defendant's residence at 937 West 54th Place. A gold-colored car was parked near the building. Defendant was arrested shortly thereafter.

Chicago police detective Daniel McInerney testified that he saw Erica at the hospital at about 2 a.m., and Erica said that her daddy shot her and her mom and identified defendant as Will in two

photographs. When asked who Will was, Erica told McInerney that Will was her daddy.

In a sidebar, the parties and the trial judge discussed an order *in limine* entered on the State's motion to bar the defense from eliciting testimony from any State witness as to exculpatory statements made by defendant. Defense counsel indicated that he did not intend to pursue such questioning. Back in court, defense counsel asked McInerney on cross-examination if defendant was interrogated twice at Area One police headquarters. The trial court halted testimony and told defense counsel outside the presence of the jury that he was attempting to elicit evidence in derogation of the court's order. The court warned counsel that he would be held in contempt if that line of questioning continued.

Defense counsel then asked McInerney if defendant made any admissions or gave a confession at police headquarters. The trial court found defense counsel to be in direct criminal contempt and fined him $100 and told counsel that he would spend the night in jail if the order was violated again. When defense counsel resumed cross-examination, counsel asked about McInerney's conversations with Erica and then asked if defendant was taken to police headquarters and interrogated. The trial court immediately recessed for the evening and again found defense counsel in direct criminal contempt for violating the court's order. Defense counsel spent the night in jail.

The next day, the trial continued without incident. Dr. James Paul Kelly was qualified as an expert in the field of neurology and behavioral neurology, and he testified regarding Elaine Sutherland's injuries. Kelly stated that bullet fragments remained in the back of Elaine's head from a gunshot wound to that area and that injury caused neurological damage from internal bleeding and affected her nervous system. Kelly testified that Elaine had permanent brain damage that affected her coordination, mental functions and speech.

The defense presented several witnesses. Teresa Harris testified that, at about 10:30 p.m. on the night of the shooting, she was walking toward 68th and Sangamon when she saw a black man run from between two houses. In court, Harris did not identify defendant as the man she saw, saying that she had never seen defendant before. She said she did not get a good look at the man who was running because she thought he was carrying a gun and she was trying to get out of his way. On cross-examination, Harris stated that she only saw the man for about a second and that she was not sure where he came from.

Kristie Burks testified that she lived at 6812 South Sangamon on the night of the shooting. Hardy, Burks' sister, arrived with Hardy's husband a few minutes before 10:30 p.m. As Hardy's car pulled up in

front of the house, a gold car parked in front of their car. On cross-examination, Burks stated that she had previously seen defendant driving the gold car.

Tamika Webb, defendant's cousin, testified that on the night of the shooting Webb arrived at defendant's residence between 7 and 8 p.m. to play cards and drink. She saw defendant there but said he left the apartment at about 9:40 p.m. with his son because his son was ill. Indira Sutherland, defendant's sister, offered similar testimony, adding that defendant returned to the house shortly after 11 p.m. Shakira Sutherland, another sister of defendant, testified that she was also at the party beginning at about 7 p.m. and that she was unaware of defendant's presence or absence. Myosha Webb testified that she was at the party and that defendant left at about 10 p.m. and returned at about 10:30 p.m. Eric Mills testified that he had known Elaine and the children personally for about eight years and that Erica always called defendant "Will."

Defendant testified that he went to Ellison's house the day before the shooting to get his son's medical identification before taking him to the hospital. Defendant said he returned to the house at 9 or 10 p.m. on the night of the shooting to give Elaine a word processor. Defendant said he opened the trunk of his car to remove the equipment but did not take the word processor to the door because it was raining.

On cross-examination, defendant stated that he was 6 feet 3 inches tall, weighed 220 pounds, wore glasses and had a beard, which he also had in April 1997. Defendant had known Erica since she was one or two years old and he stated that she only called him Will or her stepfather. Defendant said Erica sometimes confused defendant with Mills and did not know defendant's last name.

The jury found defendant guilty of the attempted first degree murder of Elaine Sutherland and Erica Ellison, two counts of aggravated battery with a firearm, and home invasion. The court sentenced defendant to 30 years for each count of attempted murder and 30 years for home invasion, to be served consecutively for a total sentence of 90 years.

■ On appeal, defendant first contends that the trial court abused its discretion in finding Erica Ellison competent to testify. Pursuant to section 115—14(a) of the Code of Criminal Procedure of 1963, all witnesses, regardless of age, are presumed competent to testify. 725 ILCS 5/115—14(a) (West 1998); see also *People v. Westpfahl*, 295 Ill. App. 3d 327, 330-31, 692 N.E.2d 831, 834 (1998). Potential witnesses can be disqualified if they are incapable of expressing themselves in a manner in which they can be understood or incapable of understanding the duty of a witness to tell the truth. 725 ILCS 5/115—14(b)(1), (b)(2)

(West 1998). The burden of proving that a witness is not competent falls upon the party challenging the witness' ability to testify. 725 ILCS 5/115—14(c) (West 1998). The question of a witness' competency is to be determined by the trial judge, and a reviewing court may not disturb that determination absent a clear abuse of discretion. *People v. Dempsey*, 242 Ill. App. 3d 568, 583-84, 610 N.E.2d 208, 217-18 (1993).

Defendant contends that Erica failed to show that she understood her duty to be truthful and instead demonstrated an inability to distinguish between fantasy and reality. He points out that when Erica was asked if she knew the difference between telling the truth and telling a lie, she said that she did and that telling the truth made people "happy" and lying made people "mad." When asked if it was better to tell the truth or a lie, she responded, "The truth." Defendant argues that because Erica stated that "you have to tell the truth so you will make people happy," it is possible that the child was told how to answer particular questions and therefore may have provided those answers to please her mother or the prosecution. Defendant also emphasizes that when asked if the Power Rangers cartoon characters had "real fights or pretend," Erica replied that they had "real fights."

■ No basis exists to disturb the trial court's determination that the six-year-old girl was a competent witness. Erica's testimony revealed that she knew the difference between telling the truth and lying and that she would tell the truth in court. Erica's answers indicated that she thought it was wrong to tell a lie, because people would be "mad" and she would get a "whopping." See *Dempsey*, 242 Ill. App. 3d at 584, 610 N.E.2d at 218 (nine-year-old sexual abuse victim found competent to testify after stating, *inter alia*, that if he told a lie he would "go to the devil," demonstrating his understanding that it was sinful to lie). Moreover, Erica indicated that she understood the difference between fantasy and reality, stating that Oscar from "Sesame Street" was "pretend" because he was "not a human" and that Big Bird was also "pretend." It is not incumbent upon a child to give perfect answers to questions asked during the competency determination or at trial to be deemed a competent witness, as one imperfect response to a question is insufficient to invalidate a finding of competency in light of the totality of the responses. See *Dempsey*, 242 Ill. App. 3d at 584, 610 N.E.2d at 218. The trial court did not err in finding Erica Ellison competent to testify.

■ Defendant next contends that the State failed to prove his guilt beyond a reasonable doubt because its case relied on circumstantial evidence and Erica's inconsistent testimony. Defendant argues that only Hardy and Erica placed defendant at Doris Ellison's home on the night of the shooting and that Erica offered conflicting testimony

regarding whom she meant to identify as her "daddy." When considering a challenge to the sufficiency of the evidence, a reviewing court is required to determine, viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime had been proven beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472-73 (1989), citing *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). A reviewing court cannot substitute its judgment for that of the trier of fact, who heard the evidence presented and had the ability to observe the demeanor of the witnesses. *People v. Dizon*, 297 Ill. App. 3d 880, 887, 697 N.E.2d 780, 785 (1998).

■ Defendant acknowledges that Erica, who was an eyewitness and victim of the shooting, identified him as the gunman. As discussed above, the trial court judged Erica to be a competent witness. While Erica identified the shooter to police as her "daddy" and her testimony revealed that she called both defendant and Kendrick "daddy," her testimony that defendant shot her and her mother was unwavering. As she recounted the details of the shooting, she identified defendant by name and said that she saw his face. Erica also said that the police showed her pictures of defendant and that she told them what he did to her and her mother. The testimony of a single witness, if positive and credible, is sufficient to support a criminal conviction if the witness viewed the accused under circumstances permitting a positive identification (*People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989)), even in the face of contradictory testimony presented by the defense. *People v. Bailey*, 311 Ill. App. 3d 265, 269, 724 N.E.2d 1032, 1035 (2000). Moreover, Erica's identification of defendant was bolstered by Roberts, who testified that she told him that "Will done shot us," and also by the testimony of Officers Jointer and Kane. We find that the evidence was sufficient to support defendant's convictions.

■ Defendant's next contention on appeal is that he was denied the assistance of counsel when the trial court incarcerated his attorney overnight for contempt during defendant's trial. Defendant does not dispute the basis of the contempt finding but instead asserts the "denial of his own rights because of the severity and timing of the sanction imposed on his counsel."

Defendant's attorney was held in contempt on the third day of defendant's trial and was incarcerated the night before the fourth day of trial. On the fourth day of trial, the defense presented its entire case, including defendant's testimony. Defendant argues that his attorney emerged from his overnight incarceration sleep-deprived and lacking the mental clarity to adequately present defendant's case. The

State replies that defense counsel did not tell the court that he would need to consult with defendant on the night of the incarceration or inform the court the next day that he was unable to proceed.

Defendant likens his case to *Geders v. United States*, 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330 (1976). In *Geders*, the United States Supreme Court held that the trial court's order preventing a criminal defendant from consulting his counsel during an overnight recess between the defendant's direct examination and cross-examination violated the defendant's right to the assistance of counsel under the sixth amendment. *Geders*, 425 U.S. at 91, 47 L. Ed. 2d at 601, 96 S. Ct. at 1337. Similarly, the Illinois Supreme Court held in *People v. Noble*, 42 Ill. 2d 425, 248 N.E.2d 96 (1969), that the trial court's admonition to a defendant that he should not "discuss his testimony with anyone including his attorney" denied the defendant the effective representation of counsel. *Noble*, 42 Ill. 2d at 429, 248 N.E.2d at 99.

Here, defendant has not established that he was denied the assistance of counsel. Unlike in *Geders* and *Noble*, neither defense counsel nor defendant was sequestered by a court order, nor did the trial court order the attorney and defendant not to speak to each other. Defendant does not claim that defense counsel asked to confer with him during his night of incarceration or that he asked to see counsel that night and that such a request was denied or hindered so as to make it impossible for them to confer. Instead, defendant speculates that defense counsel did not ask jail personnel if he could meet with defendant because such a request "would have been futile." A defendant is obligated to prove that he was actually denied his right to consult with his attorney. *People v. Brooks*, 115 Ill. 2d 510, 520-21, 505 N.E.2d 336, 340-41 (1987) (trial judge's order that defendant be sequestered during lunch recess did not deprive defendant of assistance of counsel absent showing that defendant sought to communicate with attorney); *People v. Stewart*, 161 Ill. App. 3d 99, 103, 514 N.E.2d 51, 54 (1987) (defendant's placement in isolation cell during overnight recesses of his trial did not deprive him of assistance of counsel absent evidence that defendant attempted or was prevented from contacting counsel by jail authorities). Here, defendant has not shown that the trial court's overnight incarceration of his counsel for contempt prevented him from conferring with his attorney during that period or that he desired to do so. For those reasons, defendant's assertions that he was denied the assistance of counsel are unsupported.

■ Defendant also claims that a number of statements made by the prosecution during closing argument were improper and denied him the right to a fair trial. Defendant's trial counsel failed to object to any of the remarks in question and also failed to include the specific

statements in his posttrial motion, which are necessary to preserve defendant's arguments on appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1135 (1988); *People v. Smith*, 139 Ill. App. 3d 21, 27, 486 N.E.2d 1347, 1350-51 (1985) (to avoid waiver, defendant must recite in posttrial motion the specific improper remarks made by the State). Defendant asks this court to review the statements under the plain error rule, which provides for appellate review if the evidence in a case is closely balanced or if the error affected the defendant's right to a fair trial. *People v. Mullen*, 141 Ill. 2d 394, 401-02, 566 N.E.2d 222, 226 (1990); *People v. Benford*, 295 Ill. App. 3d 695, 699, 692 N.E.2d 1285, 1288 (1998). However, the evidence in this case is not so closely balanced as to require review of the complained-of statements, and based upon a review of the record, the prosecution's comments did not play a material role in defendant's conviction.

■ Defendant also contends that the trial court's application of section 5—8—4(a) of the Code in his sentencing violated the due process clauses of the fifth and fourteenth amendments, in addition to the notice and jury trial guarantees of the sixth amendment to the United States Constitution. Defendant argues that section 5—8—4(a) impermissibly allows the trial court to impose consecutive sentences based upon its own factual findings of "a single course of conduct during which there was no substantial change in the nature of the criminal objective" as well as "severe bodily injury," as opposed to requiring a determination of those facts by a jury. 730 ILCS 5/5—8—4(a) (West 1996). Defendant relies upon *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), which holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Defendant asks this court to vacate his three consecutive 30-year sentences and remand his case for a new sentencing hearing.

The State initially contends that defendant waived his right to challenge his sentence by failing to include the issue in a posttrial sentencing motion. In addition, the State argues that the recent *Apprendi* decision does not excuse defendant's failure to raise the issue because the United States Supreme Court previously decided similar cases regarding the issue of enhanced penalties based upon facts presented at sentencing. However, *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), and *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998), involved interpretations of federal sentencing guidelines, and *Apprendi* expressly applied the rules in those cases to state prosecu-

tions. *Apprendi*, 530 U.S. at 476-77, 147 L. Ed. 2d at 446-47, 120 S. Ct. at 2355-56. Therefore, the merits of defendant's claim should be addressed.

■ Defendant's argument centers upon the Code's provisions for consecutive or concurrent sentences. When a defendant is sentenced at the same time to multiple terms of imprisonment, section 5—8—4(a) of the Code provides that "the sentences shall run concurrently or consecutively as determined by the court." 730 ILCS 5/5—8—4(a) (West 1998). The section further states:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury *** in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5—8—4(a) (West 1998).

In sentencing defendant, the trial judge found that defendant had been convicted of a Class X felony and had inflicted severe bodily injury. The trial court ordered defendant's sentences to be served consecutively under section 5—8—4(a).

■ Defendant contends that, in imposing consecutive sentences, the trial court made factual findings that the home invasion and attempted murders were committed as part of "a single course of conduct during which there was no substantial change in the nature of the criminal objective" and that defendant inflicted "severe bodily injury" in the commission of the crimes. He asserts that *Apprendi* requires those determinations to be made by a jury.

The State responds that *Apprendi* is generally inapplicable to consecutive sentencing under section 5—8—4(a) because the imposition of consecutive sentences did not affect the length of any of defendant's individual sentences. The State argues that the trial court did not impose any single sentence that exceeded the statutory maximum,[1] and *Apprendi* therefore does not apply.

---

[1] The State points out that defendant was sentenced to 30 years for the attempted first degree murder of Elaine Sutherland, which was within the sentencing range for Class X felonies of 6 to 30 years. 720 ILCS 5/8—4(c) (West 1996); 730 ILCS 5/5—8—1(a)(3) (West 1996). In addition, defendant was sentenced to 30 years for the attempted first degree murder of Erica Ellison, a crime for which defendant could have received up to 60 years' imprisonment under the extended-term sentencing provisions in section 5—8—2(a)(2) (730 ILCS 5/5—8—2(a)(2) (West 1996)). Finally, for home invasion, which is a Class X felony (720 ILCS 5/12—11(c) (West 1996)), the trial court sentenced defendant to 30 years, which was within the statutory range of 6 to 30 years. 730 ILCS 5/5—8—1(a)(3) (West 1996).

In *Apprendi*, the Supreme Court addressed a New Jersey statute that classified possession of a firearm for an unlawful purpose as a second degree offense punishable by 5 to 10 years in prison. Another statute, known as New Jersey's "hate crime" law, provided for imprisonment of between 10 and 20 years if the trial judge determined by a preponderance of the evidence that the defendant "in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *Apprendi*, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. The Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

Another division of the First District has found that *Apprendi* prevents the imposition of consecutive sentences under section 5—8—4(a) and renders that section unconstitutional. *People v. Clifton*, 321 Ill. App. 3d 707 (2000). In *Clifton*, another division of this court emphasized the similar effect of the *Apprendi* statute that enhances a sentence for a particular crime and section 5—8—4(a) that increases a defendant's period of imprisonment by making sentences consecutive as opposed to concurrent. *Clifton*, 321 Ill. App. 3d at 725. Noting that the Supreme Court in *Apprendi* focused on the effect of the statute in that case and not on its form, the *Clifton* court reasoned that both statutes resulted in increased punishment, and the court vacated the order requiring the defendant's sentences to be served consecutively and ordered that the sentences run concurrently. *Clifton*, 321 Ill. App. 3d at 726-27.

More recently, in *People v. Carney*, 317 Ill. App. 3d 806 (2000), a different division of the First District expressly agreed with *Clifton* in finding that section 5—8—4(a) violates *Apprendi*. The *Carney* court found the result of section 5—8—4(a) "very similar to the effect of the New Jersey statute the Supreme Court found unconstitutional in *Apprendi*" and held that the imposition of consecutive sentences under section 5—8—4(a) was unconstitutional because the trial judge, and not the jury, determined the factual issue of whether the "severe bodily injury" to the victim occurred during the commission of the armed robbery. *Carney*, 317 Ill. App. 3d at 813.

While we are aware of those holdings, our assessment of *Apprendi*'s application to the instant case compels the opposite conclusion. In deciding whether the trial court's imposition of consecutive sentences in this case violates *Apprendi*, we find clear differences between the content of the "hate crime" statute in *Apprendi* and the content of

section 5—8—4(a). Moreover, we find that the use of the criteria in section 5—8—4(a) to increase defendant's penalty for attempted first degree murder and home invasion did not increase his sentence "beyond the prescribed statutory maximum," as *Apprendi* prohibited. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63

The *Clifton* court acknowledges "formal distinctions" between the statute in *Apprendi* and section 5—8—4(a). *Clifton*, 321 Ill. App. 3d at 726. Those differences are both substantive and substantial. While it is undisputed that a *mens rea* finding such as that made in *Apprendi* should be made by a jury and established beyond a reasonable doubt, the trial court here did not make such a finding. Instead, the trial court found that "severe bodily injury" occurred and that the events constituted "a single course of conduct during which there was no substantial change in the nature of the criminal objective." In contrast to the inquiry of the trial court in *Apprendi* into the defendant's state of mind to determine whether his purpose was to intimidate the victim based upon race, the trial court here did not define defendant's mental state or determine the existence or absence of essential elements of the offense.

Moreover, the trial judge's findings here did not increase defendant's punishment beyond the "statutory maximum." In *Apprendi*, the defendant's potential penalty was increased when the trial judge made a finding under the "hate crime" statute as to defendant's mental state. The trial judge's ruling on the "purpose to intimidate" factor determined whether the defendant would receive up to 10 years in prison (which the defendant likely thought was his maximum penalty) or up to 20 years, should the "intimidation" factor be found. Here, defendant's sentence for each crime fell within the statutory range for the offense. Defendant does not claim that he was unaware that he could be sentenced to 30 years for each crime (or an extended-term sentence of 60 years for the attempted murder of Erica Ellison), nor does he assert that he was unaware that his sentences could be served consecutively. For those reasons, we find *Apprendi* inapplicable to these facts, and defendant's request for resentencing is therefore rejected.

■ Defendant's final contention on appeal is that the trial court abused its discretion in sentencing him to 30 years in prison for the attempted murder of Erica Ellison and to a total of 90 years after the court heard evidence of his substantial rehabilitative potential. Pursuant to section 5—8—1(c) of the Code (730 ILCS 5/5—8—1(c) (West 1996)), a defendant's challenge to his sentence must be made within

30 days of sentencing. Defendant waived objection to his sentence by failing to raise the issue in a postsentencing motion. See *People v. Reed*, 177 Ill. 2d 389, 393-94, 686 N.E.2d 584, 586 (1997).

Defendant contends that his counsel's failure to file a motion challenging his sentence constituted ineffective assistance. The imposition of a sentence is a matter of the trial court's discretion, and absent an abuse of that discretion, this court should not reduce a sentence if it falls within the statutory limit. *People v. Jones*, 168 Ill. 2d 367, 373, 659 N.E.2d 1306, 1308 (1995). It is unlikely that defendant was prejudiced by counsel's failure to file a postsentencing motion, as the record indicates no abuse of discretion.

In aggravation, the trial court heard Elaine Sutherland's victim impact statement describing the lasting effects of her injuries from the shooting. The defense presented no evidence in mitigation. Prior to sentencing defendant, the trial judge stated that she had reviewed the presentence report, which included much of the information that defendant now emphasizes on appeal. The weight that the trial judge accords each factor in aggravation and mitigation, and the resulting balance that is struck among them, depends on the circumstances of the case. *People v. Grisset*, 288 Ill. App. 3d 620, 635-36, 681 N.E.2d 1010, 1021 (1997). It is presumed that a trial court's sentencing decision is based upon proper legal reasoning and that the court considered all evidence in mitigation. *People v. Hughes*, 259 Ill. App. 3d 172, 179, 632 N.E.2d 251, 256 (1994). Since we find no abuse of discretion, we decline to disturb defendant's sentences.

Accordingly, the judgment of the circuit court is affirmed. As part of our judgment, we grant the State's request to assess defendant $100 as costs for this appeal. In addition, defendant is assessed $50 as costs for oral argument.

Affirmed.

BUCKLEY and O'BRIEN, JJ., concur.