2021 IL App (1st) 191237-U

SIXTH DIVISION
March 12, 2021

No. 1-19-1237

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 15 CR 8471 |
| | ) | |
| DEMETRIUS SPENCER, | ) | Honorable James B. Linn, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

---

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:*   Defendant's 40-year sentence for first-degree murder did not violate the proportionate penalties clause as applied to him, and the trial court did not abuse its discretion in sentencing defendant to 40 years in prison; affirmed.

¶ 2    Following a jury trial, defendant, Demetrius Spencer, was convicted of first-degree murder and sentenced to 40 years in prison. On appeal, defendant contends that his 40-year sentence, that is to run consecutively to a previously imposed 20-year sentence for aggravated battery with a firearm, is unconstitutional under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), and is excessive. Defendant, who was 19 years old at

the time of the offense, claims that the trial court sentenced him without any consideration of his youth or rehabilitative potential to a *de facto* life sentence. For the following reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4      Defendant was charged with first-degree murder for the shooting death of Bernard Welch. Defendant's trial occurred simultaneously, but before different juries, as that of codefendant David Newell.

¶ 5                                        A. Trial

¶ 6      Latasha Cole, also known as Latasha Wilkes, testified that she was the victim's mother. The victim, who was 20 years old, lived with her in 2011 in Chicago. She last saw him alive on the morning of November 30, 2011. She received a call later that day that her son had been shot. She went to 57th and Winchester, where her son had been visiting his great-grandmother, and saw an ambulance and a crowd of people. She saw him in the back of the ambulance and followed it to Stroger Hospital. The victim was at Stroger Hospital from November 30, 2011, to January 9, 2012, when he died. Cole testified that the victim was not involved in any gang activity.

¶ 7      Michael Green, the victim's cousin, testified that in November 2011, he lived with his mother and his cousin, Tiwanna Green, who has a child with codefendant Newell. Green had known defendant for 15 to 20 years from the neighborhood and identified him in court. Green often saw defendant and Newell together in the neighborhood.

¶ 8      On the date in question, at around 6:35 p.m., Green was in his home with his family when he heard constant gunfire from the front of the house. He could not tell how many shots were fired. Green ran outside and saw three to four people running through the gangway across the street. He recognized defendant as the second or third in line because he saw the side of his face.

The area was well-lit with streetlights and Green was wearing his glasses. Green did not get a good look at the others. He saw the group head west on Damen before he lost sight of them.

¶ 9     Green saw his cousin, the victim, laying on the curb next to his house. Green tried to talk to the victim, but he was coughing up blood. He noticed the victim's wounds and that there was "a lot" of blood coming from different spots in the victim's chest. Green yelled for help but did not have a cell phone. Green held his cousin until the police and an ambulance arrived. He told an officer on the scene he knew who the shooter was. He identified defendant in a photo array.

¶ 10    In the early morning hours the day after the shooting, Green went to defendant's Facebook page, which was called Hoyne Boy General, and wrote, "Yall shot my cousin ten times and he wasn't who yall's looking for." The Facebook post was admitted as an exhibit.

¶ 11    Green testified that he had a pending armed habitual criminal matter and was not offered any promises in exchange for his testimony. He had a 2011 drug conviction and was a member of the Black P Stones gang.

¶ 12    Robert Goodman testified as to his involvement in the shooting. He admitted that he had one possession of a weapon in jail conviction and he was a member of the Hoyne Boys gang. Goodman testified that he distributed drugs for Hoyne Boys, including cannabis, ecstasy, and crack cocaine. He identified defendant and Newell as fellow gang members. He had known defendant since they were young but met Newell in 2009 or 2010.

¶ 13    Goodman stated that he knew of the Winchester Boys, another gang that shared territory with the Hoyne boys. The two gangs did not get along and had exchanged gunfire in the past. In October 2011, Christopher Abernathy, the father of Goodman's niece, was killed in a shooting by a rival gang. Wallace, an older "homie" of Winchester Boys, mocked Abernathy's murder on

Facebook, so Goodman and his fellow gang members decided Wallace had to be "dealt with," meaning he had to be killed.

¶ 14    On November 30, 2011, Goodman was at Derrick Pouncey's house with defendant, Newell, and Parish Thomas. They were all members of Hoyne Boys except Pouncey, who was just a friend. There were two "gang guns", that Goodman had seen on numerous occasions, on the table. One was a .45 caliber automatic handgun, and the other was a .44 revolver.

¶ 15    Defendant then received a phone call stating that Wallace was on Winchester. They left "to take care of their business, do what we were going to do," which was to kill Wallace. Goodman saw defendant grab the .44 revolver and Newell grab the .45 caliber automatic handgun. They all went through a gangway and then an alley to avoid detection. Pouncey left the group at that time.

¶ 16    Goodman and defendant headed north while Newell and Thomas headed south. Goodman's role was to watch for police or rival gang members. They saw a heavyset person wearing black clothes that appeared to be Wallace. Goodman saw defendant fire his weapon. He saw four flashes and heard ten gunshots in total that sounded like they came from two different guns. Goodman saw the person he believed to be Wallace fall. The group then left the way they came, through the gangway.

¶ 17    A few days later, Goodman found out that the wrong person was murdered. When he ran into defendant and told him, defendant laughed and said, "he shouldn't have been out there."

¶ 18    Goodman was arrest for the murder of the victim on June 6, 2013. He pled guilty to conspiracy to commit murder in exchange for a recommended 14-year sentence in the Illinois Department of Corrections if he testified truthfully. Goodman identified photographs of

defendant making a gang symbol with his hands, as well as a photograph of defendant handling a .45 caliber gun and wearing a shirt with a picture of Abernathy on it.

¶ 19    Officer Daniel Kasper testified that he executed a search warrant on December 12, 2011, at Melvin Hunter's house, located at 5540 S. Hoyne. Nine other officers and two sergeants assisted. The target of the search warrant was narcotics. Officer Kasper knocked on the door and yelled, "Chicago police, search warrant." A male appeared and yelled, "They're all coming in here." The door was then breached because Officer Kasper worried that evidence would be destroyed. As Officer Kasper entered, he saw defendant, who he identified in court, sitting on the couch pushing a .45 caliber Taurus handgun down between the couch cushions. Defendant then fled. He was detained in the hallway. The gun was secured and inventoried.

¶ 20    The gun was recovered and admitted into evidence as an exhibit at trial. Photographs of defendant, including one of his forearm that depicted a Hoyne Boys tattoo, were admitted into evidence as well.

¶ 21    Officer Kasper testified that defendant agreed to make a statement at the police station, after being advised of his *Miranda* rights. When asked why he had a gun, defendant stated that he kept it for protection from the Winchester Boys.

¶ 22    Chicago Police Detective Scarriot, an evidence technician, testified that on November 30, 2011, he responded to 5737 S. Winchester. The victim had already been taken to the hospital when he arrived on the scene. Once there, he found two shell casings at 5740 Winchester and seven shell casings at 5737 Winchester, across the street. All nine casings were from a .45 caliber gun. There was a bullet hole in a window of a house at 5737 Winchester, and damage to a car windshield down the street.

¶ 23    Dr. Kristin Howell, an assistant medical examiner, testified that she reviewed the victim's autopsy, which was performed by Dr. Ariel Goldschmidt on January 10, 2012, and the victim's medical records from Stroger Hospital, where he was treated for nearly six weeks before his death. The victim's treatment consisted of 17 surgeries to treat 12 gunshot wounds to the neck, chest, abdomen, back, and thighs. Dr. Howell concluded that the victim died from multiple gunshot wounds, which was consistent with Dr. Goldschmidt's opinion.

¶ 24    Forensic scientist Jennifer Hanna, who worked at the time for the Illinois State Police, testified as a firearms expert. She received nine fired .45 caliber cartridge casings from the scene. She also recovered three fired bullets. Hanna examined the .45 caliber semiautomatic handgun defendant had attempted to hide in a couch and had test shots fired from it. Hanna compared the nine casings and three recovered bullets to the test shot casings and concluded they were all shot from the firearm in question.

¶ 25    Derrick Nicholson, an inmate at Kane County jail, testified that he had a pending case for manufacture and delivery of a controlled substance, two felony aggravated DUI convictions, and one aggravated battery conviction. He grew up in the Englewood neighborhood and was familiar with Wallace. Nicholson denied any knowledge about gangs in the area, including the Hoyne Boys and the Winchester Boys. Nicholson was standing in the street near 55th and Winchester on May 18, 2012, with Tatiana Mason, Lonya Barr, James Akines, and Wallace, when he was shot in the leg. Nicholson saw a car drive by when he was standing in the street before the shooting. He started running when he heard multiple shots fired. He was taken to Stroger Hospital where he talked to Detective Bill Sullivan and his partner. Nicholson told the detectives that he saw a gray-blue Nissan Altima drive by on the date in question but did not see the driver of the car. Nicholson did not recall seeing Newell in the back of the car, shooting a handgun in

his direction. He did not remember being shown a photo array a week later and denied that his signature was on that exhibit. Nicholson did not remember being shown a lineup and denied that his signature was on the advisory form.

¶ 26     Nicholson met with Assistant State's Attorney (ASA) Bridget O'Brien on May 12, 2014. He denied giving her specific statements about the details of the shooting. He did not remember reviewing his typed statement with her. He recognized the statement he gave to ASA O'Brien but denied that his signature was on the bottom of the page. Nicholson identified attached photographs of the other people present at the scene but denied that his signature was on the photographs.

¶ 27     ASA O'Brien testified that she met with Nicholson and Detective Sullivan in May 2014, and that Nicholson gave her a handwritten statement. Nicholson told ASA O'Brien that he had seen a car driving southbound on Damen a couple days before the May 18, 2012, shooting. He knew the car was occupied by Hoyne Boys. Which Nicholson was standing in the street with Mason, Barr, Akines, and Wallace, he saw the same car drive by right before the shooting. Nicholson stated that he could see inside the car and saw Newell, someone he knew as a Hoyne Boys gang member. When the car stopped, the rear passenger seat window rolled down, and Nicholson saw Newell start shooting, so he ran.

¶ 28     Detective William Sullivan testified that he and his partner received an assignment to investigate a shooting on May 18, 2012. The three victims, Barr, Mason, and Nicholson, were associated with the Winchester Boys. He later learned that the Winchester Boys were in conflict with the Hoyne Boys. While Detective Smith was investigating the shooting, another officer, Officer Jimmie Smith, informed him of the victim's murder that had occurred on November 30, 2011. The following day, Detective Sullivan reviewed the case and realized nothing had

progressed. He submitted all recovered evidence, the nine shell casings from the scene, the three fired bullets, and the .45 caliber handgun, for testing at the Illinois State Police Lab.

¶ 29     Detective Sullivan testified that he then met with the victim's cousins, Michael Green, and that Green identified defendant as the person he saw fleeing into a gangway after he heard gunshots on the night the victim was killed. He also met with Goodman.

¶ 30     Detective Sullivan questioned defendant, who was under arrest, on June 4, 2012. Defendant stated that on the evening in question, he was in a vehicle with Hunter (the driver), and Newell. They drove down the 5500 block of South Winchester because they wanted to see if any of the Winchester Boys were on the block. They observed three Winchester Boys gang members drinking in the street. They left and Newell retrieved a 9-millimeter handgun. They were looking for Wallace because he mocked the death of Abernathy on Facebook. When they arrived back at the 5500 block of South Winchester, Newell shot five times.

¶ 31     Detective Sullivan also met with Nicholson, who identified Newell as the man who was shooting from the backseat of the vehicle. He also identified Newell in a lineup on June 4, 2012, after he had been arrested.

¶ 32     Officer Jimmie Smith, a gang enforcement officer, testified that the Hoyne Boys were made up of members from several gangs, including the Conservative Vice Lords, Insane Gangsters, and Outlaw Gangsters. The Winchester Boys were made up of members of the Gangster Disciples and Black P Stones. Both gangs had 20 to 40 members. In 2011, the Hoyne Boys and the Winchester Boys were in conflict, and as a result, 20 to 40 shootings occurred in that time frame. Officer Smith knew of defendant and Newell, and identified pictures of defendant, defendant's Facebook profile, and his Hoyne Boys tattoo. To his knowledge, the victim was not involved in gang activity.

¶ 33    At the close of evidence, the jury found defendant guilty of first-degree murder. The jury did not find that the firearm enhancement was proven.

¶ 34                                B. Sentencing Hearing

¶ 35    At the sentencing hearing, the State requested that the court take judicial notice of Sergeant Santos' testimony from defendant's sentencing hearing on his conviction for aggravated battery with a firearm (12 CR 11612). At that hearing, Sergeant Santos testified about the circumstances of a juvenile adjudication incident that had happened in 2007. At that time, he saw another officer, Officer Torres, park his vehicle and engage in conversation with defendant. Defendant was "fidgeting" with an object in his hand, reached in the vehicle, and struck Officer Torres in the face. Defendant then grabbed something and fled. Defendant was arrested and found with narcotics. The court agreed to take judicial notice of this testimony.

¶ 36    The court also agreed to amend the Presentence Investigation Report (PSI) to reflect that defendant was sentenced in the aggravated battery with a firearm matter to two consecutive 10-year sentences in the Illinois Department of Corrections.

¶ 37    The PSI listed defendant's birthdate as April 13, 1992, making him 19 years old at the time of the 2011 shooting. The PSI revealed that defendant completed his GED while incarcerated, he has one child, he admitted to being an Insane Gangster Disciples gang member, and he had a positive attitude when he was being interviewed.

¶ 38    The State presented the court with a victim impact statement from the victim's mother, Latasha Cole. The State then noted that defendant had been involved in the criminal justice system since 2005, when his juvenile probation was revoked, and defendant was sent to the juvenile department of corrections. The State noted that the applicable sentencing range was 20 to 60 years, and asked the court to sentence defendant to the maximum of 60 years in prison.

¶ 39    Defense counsel argued in mitigation that defendant was 26 years old at the time of the sentencing and had dropped out of school in the 11th grade. Defendant was raised by his great aunt, who was present in court. When defendant dropped out of school after struggling for many years, he began getting into trouble. Defense counsel argued that defendant was still young and had time to rehabilitate himself and become a productive member of society.

¶ 40    The court then asked how old defendant was, to which defense counsel replied that he was 26 years old. Defense counsel ended her argument acknowledging the sentencing range and requesting the minimum sentence of 20 years in prison.

¶ 41    Defendant, when given an opportunity to speak, stated that he was innocent and apologized to the victim's family.

¶ 42    The court then stated:

        "I'm acutely aware of what was going on in the street in the

        Winchester/Hoyne area on the south side, the animosity between these two gangs

        and the determination of [defendant] and other people with him to take action

        against somebody in the other gang. On more than one occasion people were shot,

        the wrong people. Every time they shoot, they're shooting the wrong people, but

        that never seemed to stop them from continuing to do it again and staying in

        possession of guns after that.

        I understand that [defendant] was not alone in what he did. He may not

        have been the leader in what he did also. I can give him up to 60 years

        consecutive. I'll not go that far."

¶ 43    The trial court sentenced defendant to 40 years in the Illinois Department of Corrections for first-degree murder, to run consecutively to defendant's 20-year sentence for the conviction

of aggravated battery with a firearm (12 CR 11612). Defense counsel filed a motion to reconsider sentence, which was denied. Defendant now appeals.

¶ 44                                    II. ARGUMENT

¶ 45    On appeal, defendant contends that the 40-year sentence violates Illinois' proportionate penalties clause as applied to him, or alternatively, that his sentence is excessive.  Defendant also contends he received ineffective assistance of counsel for defense counsel's failure to challenge the constitutionality of defendant's sentence.

¶ 46                          A. Proportionate Penalties Clause

¶ 47    Defendant contends that the trial court erred by not considering his youth as a mitigating factor when imposing the sentence. Defendant argues that his 40-year sentence is a *de facto* life sentence and that the protections afforded juveniles in sentencing under *Miller v. Alabama*, 567 U.S. 460 (2012), should be extended to him. The State responds that defense counsel failed to raise this issue in the trial court, and therefore this issue has been forfeited. While defense counsel argued in her posttrial motion that the sentence was excessive and that the trial court did not properly consider the proportionate penalties clause, below we discuss the implications of defense counsel's failure to raise a specific *Miller* challenge.

¶ 48    Defendant contends that the court was required to consider his youth and enhanced amenability to rehabilitation under article I, section 11, of the Illinois Constitution of 1970. Section 11, which is commonly referred to as the proportionate penalties clause, provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In *Miller*, the Supreme Court held that the imposition of a mandatory sentence of life without the possibility of parole for a juvenile offender who commits murder without consideration of the

defendant's youth and attendant characteristics violates principles of the proportionality and thus the eighth amendment's ban on cruel and unusual punishment. *Id*. at 479-80. Now, a trial court must consider a juvenile's "youth and its attendant characteristics" and find that the conduct "showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" before the offender may be sentenced to life imprisonment without parole. See *People v. Holman*, 2017 IL 120655, ¶ 46. In conducting this analysis, the court in *Miller* outlined a nonexclusive list of characteristics to be considered by the sentencing court. *Id*. These characteristics were later memorialized in *Holman* as a set of factors:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. *Id*. (citing *Miller*, 567 U.S. at 477-78).

¶ 49 In *People v. Reyes*, 2016 IL 119271, our supreme court extended *Miller* protections, finding that sentencing a juvenile offender to a *de facto* life sentence constitutes cruel and unusual punishment in violation of the eighth amendment. *Reyes*, 2016 IL 119271, ¶ 9. In *Holman*, our supreme court extended *Miller* protections to include not just juvenile mandatory *de facto* life sentences, but also juvenile discretionary life sentences. *Holman*, 2017 IL 120655, ¶ 40. Thereafter, our supreme court in *People v. Buffer*, 2019 IL 122327, ¶ 41, determined that "a prison term of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life

12

sentence." We note that defendant's sentence is 40 years in prison. Thus, applying our supreme court's determination to the facts of this case, we find that defendant's sentence, which is "40 years or less" is not a *de facto* life sentence. See *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 127 (a prison sentence that is exactly 40 years is not a *de facto* life sentence). However, even if defendant's sentence was to be considered a *de facto* life sentence, his claim would be more appropriately raised in a postconviction petition, as explained below.

¶ 50    In *People v. Harris*, 2018 IL 121932, our supreme court opened the door to the availability of *Miller* protections to young adult offenders bringing an "as applied" challenge to their life sentences under both the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The defendant in *Harris* was convicted of first-degree murder, attempt first-degree murder, and aggravated battery with a firearm and was sentenced to a mandatory minimum aggregate term of 76 years in prison. *Harris*, 2018 IL 121932, ¶ 1. The defendant was 18 years and 3 months old at the time of his offenses. *Id*. The defendant appealed his sentence raising an as-applied challenge under the proportionate penalties clause, as well as a facial challenge to the eighth amendment. *Id*. at ¶¶ 37, 53. In analyzing his claims, the court stated:

> "A party raising a facial challenge must establish that the statute is unconstitutional under any possible facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party. [Citations.]
>
> All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of

those facts and circumstances for purposes of appellate review. [Citations.] We have reiterated that:

> 'A court is not capable of making an as-applied determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional as-applied is premature. [Citations.]' " *Id.* ¶¶ 38-39, 52-53.

¶ 51 The *Harris* court explained that because the defendant's as-applied claim was not raised in the trial court and he was a young adult such that "*Miller* does not apply directly to his circumstances" the record needed to "be developed sufficiently to address defendant's claim that *Miller* applied to his particular circumstances." *Id.* ¶¶ 45-48. The court declined to remand the case for an evidentiary hearing but stated the defendant's claim could more appropriately be brought as a postconviction petition. *Id.*

¶ 52 Similarly here, defendant raises an as-applied constitutional challenge to his 40-year sentenced under the proportionate penalties clause, but failed to raise the *Miller* issue in the trial court. Thus, an evidentiary hearing was not held on his constitutional claim, and the trial court did not make any findings of fact on defendant's specific circumstances. Defendant nonetheless argues that the record has been sufficiently developed to address his constitutional claim. He claims that the record "establishes [his] age, the facts of the case demonstrate youthful impulsiveness and influence of peer pressure, and the sentencing transcripts demonstrate that these factors were not considered as required." Specifically, defendant contends that he was 19 years old at the time of the offense and that there was "extensive evidence" to show that

14

defendant "was engulfed and surrounded by gang culture," which "further speaks to the influence of peer pressure in this case."

¶ 53     While defendant maintains that the record includes sufficient information about his personal history to determine whether the evolving science on juvenile maturity and brain development applies to him, our review of the record, as was the case in *Harris*, "includes only basic information about defendant." *Id*. ¶ 46. "An evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to defendant as an adult." *Id*. The record here does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the decision in *Miller* applies to defendant's specific facts and circumstances. *Id*. Accordingly, defendant's as-applied challenge is premature. *Id*.

¶ 54     We note that the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2018)) is designed to resolve constitutional issues and defendant's claim could also potentially be raised in a petition seeking relief from a final judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). See *People v. Thomas*, 2015 IL 118151, ¶ 44; *Harris*, 2018 IL 121932, ¶ 48. The Post-Conviction Hearing Act specifically allows for raising "constitutional questions which, by their nature, depend upon facts not found in the record." *People v. Thomas*, 38 Ill. 2d 321, 324 (1967). This would be one such constitutional claim if defendant's sentence was indeed a *de facto* life sentence.

¶ 55     Additionally, to the extent that defendant argues that counsel was ineffective for failing to bring an as-applied constitutional challenge in the trial court, we reiterate that defendant's 40-year sentence is not a *de facto* life sentence (*Gunn*, 2020 IL App (1st) 170542, ¶ 127), and therefore defense counsel was not ineffective for failing to raise an as-applied challenge based on

a *de facto* life sentence. We note that even if defendant's sentence was considered a *de facto* life

sentence, claims of ineffective assistance of counsel are commonly raised in postconviction

proceedings because they often require presentation of evidence not contained in the record.

*Harris*, 2018 IL 121932, ¶ 48. Again, we do not have the evidence on appeal that would be

needed to make the decision on whether defense counsel was ineffective for failing to bring an

as-applied challenge, because we do not know what evidence would have been submitted on that

claim.

¶ 56                                    B. Excessive Sentence

¶ 57    Defendant argues in the alternative that his sentence of 40 years in prison for first-degree

murder is excessive. The trial court has broad discretionary powers in determining a defendant's

sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Its decision is given great deference

because the trial judge is in the best position to make a reasoned judgment, weighing factors such

as its direct observations of the defendant and his character. *People v. Fern*, 189 Ill. 2d 48, 53

(1999). We must not substitute our judgment with respect to sentencing for that of the trial court

merely because we would have weighed factors differently. *Id*. Therefore, a sentence imposed by

the trial court will not be altered absent an abuse of discretion. *Stacey*, 193 Ill. 2d at 209-10.

¶ 58    In determining an appropriate sentence for a defendant, the sentencing court must weigh

both aggravating and mitigating factors. See 730 ILCS 5/5-5-3.1 (West 2008). When such factors

have been presented to the court, it is presumed that they have been considered, absent some

contrary indication. *People v. Sutherland*, 317 Ill. App. 3d 1117, 1131 (2000). Moreover, the

sentencing court is not required to recite or assign a value to each factor in mitigation or

aggravation that forms part of the record. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 14. A

sentence within the prescribed statutory range is presumed to be appropriate and will not be

deemed excessive unless the defendant affirmatively shows that his sentence varies greatly from the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *Fern*, 189 Ill. 2d at 54.

¶ 59    As defendant acknowledges, the range for his murder conviction is between 20 and 60 years in prison (730 ILCS 5/5-4.5-20(a) (West 2018)). Defendant was sentenced to 40 years in prison, which is well within the sentencing range and thus is presumed proper.[1]

¶ 60    In challenging his sentence, defendant contends that the trial court failed to properly consider his rehabilitative potential. Specifically, defendant claims that the trial court failed to consider his youth, his PSI which showed that he earned his GED while in the Cook County Jail, that defendant had a positive attitude despite his unstable childhood, and that defendant expressed "sorrow" about the case.

¶ 61    However, contrary to defendant's claims here, there is no indication that the sentencing court failed to consider these factors. Instead, the record demonstrates that defense counsel highlighted these points, arguing that defendant was young and still had time to rehabilitate himself and become a productive member of society. The trial court specifically asked defense counsel during her argument how old defendant was at the sentencing. The PSI revealed that defendant completed his GED in the Cook County Jail, and that he had a positive attitude when interviewed. Given that these factors were presented to the court, it is presumed that the trial court considered them, absent some contrary indication. *Sutherland*, 317 Ill. App. 3d at 1131.

---

[1] We note that the fact that defendant is to serve this sentence consecutively to his 20-year sentence for aggravated battery with a firearm (730 ILCS 5/5-8-4(d)(1) (West 2016)), has no bearing on the excessiveness of his sentence for first-degree murder. See *People v. Anderson*, 325 Ill. App. 3d 624, 638 (2001) ("consecutive sentencing does not increase any of defendant's individual sentences for an offense beyond the statutory maximum, but determines the manner in which those sentences will be served."); see also *People v. Phelps*, 211 Ill. 2d 1, 14 (2004) (consecutive sentencing determines only the manner in which a defendant will serve his sentences for multiple offenses); *People v. Avery*, 321 Ill. App. 3d 414, 419 (2001) (the imposition of consecutive sentences does not constitute an increase in penalty).

¶ 62    In handing down the sentence, the trial court acknowledged the gang animosity and defendant's decision to take part in retaliation against someone in another gang. The court noted that it understood defendant was not alone in what he did and that he may not have been the leader. The court stated that while it could impose a sentence of up to 60 years, consecutive to defendant's other 20-year sentence for aggravated battery with a firearm, it would not do so. The trial court sentenced defendant to 40 years in prison. While the trial court did not specifically mention the factor defendant points to in mitigation, we reiterate that the sentencing court is not required to recite or assign a value to each factor in mitigation or aggravation that forms part of the record. *Daniel*, 2014 IL App (1st) 121171, ¶ 14.

¶ 63    Ultimately, while it is true that a sentencing court is to keep in mind the "objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art I, §11), it is not required to give that more weight than the seriousness of the crime, protection of the public, and punishment. See *People v. Harris*, 294 Ill. App. 3d 561, 569 (1998). Nor is it required to do this with a defendant's rehabilitative potential (*People v. Wilburn*, 263 Ill. App. 3d 170, 185 (1994)), or his youth (*People v. Hoskins*, 237 Ill. App. 3d 897, 900 (1992)). Thus, we cannot find that the trial court ignored defendant's rehabilitative potential.

¶ 64                                III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 66    Affirmed.